I represent Ricardo Gonzalez. I did so in the district court and also on appeal. There's four issues for appeal. The second issue that's outlined in the brief has to do with the Belton issue. And the Supreme Court recently accepted certiorari on what I think would be dispositive of that issue on the requisite justice of the statute. And I think that's what we're going to have to look at. for a vehicular search incident to arrest when the occupants are secured prior to the search beginning. So if the court doesn't grant or reverse the ruling on suppression after the first issue, I think it probably would be appropriate to wait and see what the Supreme Court does in the case before them, which is Arizona v. Gant. And that was just accepted for certiorari last month. that you agree. At present, we don't have anything that's going to help you. States v. Weaver being the last. Go ahead. I do think that the other three issues that are raised are each significant and each warrant a great deal of consideration. The first issue I'd like to discuss is whether or not the stop was prolonged. And I know that there has been a lot of recent activity by the circuit in that area. And I know that Judge Paez was recently involved in a case, Turvin, just two weeks ago, which was not in the briefs because it was so recent on whether or not... Doesn't the majority opinion in that case foreclose your argument? No, I don't. And I certainly wanted to address that with the court. I think, I understand, Your Honor, didn't agree with the majority and it is what it is. That's why I said didn't the majority opinion in that case foreclose your argument. I think that this case is readily distinguishable even from the majority. I see the majority opinion as saying two things. One is overall we look at whether or not the officer behaved reasonably and whether or not, even though some time may have passed, if the main focus of the officer was on the purpose of the stop, that's good enough under Terry. And in that case, there was ten full minutes in Turvin that were spent talking to the passengers about the stop. There were multiple violations. There were seat belt violations by both the driver and the occupant. So the officer did have reason to run both names in that case. But counsel, right in there, which I appreciate my colleague did not agree with, it says brief pauses to ask questions during traffic stops, even if those questions are unrelated to the purpose of the stop, are permissible. Right. And so that's the second issue. I do think that Turvin stands for a brief pause is okay. And I think that this case the pause wasn't brief because it wasn't just that Officer Garcia was asking the passengers for their names. He then took the time to enter each one of those names into a database and wait for the response. And Judge Shea didn't find that he received the response as to the person who had a warrant right away. He said that eight minutes passed for running all those names. Officer Garcia testified it would take two minutes per name. That's what led Judge Shea to decide it was eight minutes for all the names. And that was time that would not have otherwise been spent. The difference between six and eight isn't brief. I mean, the bottom line is here, he was going through a stop and he said to the passengers, whatever, what are your names? And they told him. He didn't say what are your names. He said, what are your names? And by the way, you don't have to tell me what your names are. You don't have to tell me anything about it. And they still told him and then he runs it and you're going to suggest undetermined. I appreciate my colleague. Frankly, I felt like what he was writing was pretty good. But I didn't know how to get around what Wallace wrote. Well, he certainly insisted that this was voluntary because Washington State does not allow an officer to require passengers to give you their names during a traffic stop. But what's interesting, too, and what distinguishes this case from other cases is that the pause was more than brief. It was several minutes and it wasn't spent just asking a question. It was spent running things in a database. What's interesting is in the middle. And a lot of times an officer will take time to do things in the middle of a stop that don't prolong the stop. They ask questions unrelated. But it doesn't prolong the time of the stop like in Mueller v. Mina. But in this court, way back in the case United States v. Luckett, the court said, well, the time spent to run a person's name in a database, if it's not necessary for the purpose of the stop, is significant. And that's precedent from this court. Well, but Florida v. Bostic says that even when officers have no reason for suspecting a particular individual, they may generally ask questions of that individual, ask them to examine their ID, even request to search the luggage. I mean, so that's Florida. That's in 1991. And now we're arguing about this. I think what I'd like you to talk about is what about the scope of the examination? Of the at trial? Yeah. I certainly want to get to that. That's where I'd get to. I just want to finish off a couple of points of this, and I promise it won't take very long. But I think that if what happened in this case was that Officer Garcia focused on the driver, as I think he must have, and just responds to her infraction and issued a ticket there, he wouldn't have spent the six minutes to run names in databases and get a return on that. He wouldn't have done that. Let's say he would have done that at the end of the stop rather than in the middle. If he would have done it at the end of the stop, Luckett would have said, it's over, that's illegal, that's prolonged. It's not just asking questions. It's actively taking up officer time to do something while he can't be doing anything else. And in this case, unlike Turbin, where for the most part the officer was concentrating on the purpose of the stop, this stop was an early morning stop based on a very minor traffic infraction. It's the officer never from the get-go focused on the reason for the stop. He was asking questions. What are these people doing? Young people doing at 2 o'clock in the morning driving around. I'm going to ask all their names. I'm going to ask where they're going. And I'm going to run each one of their names in the database, even though that takes a lot of time. If he would have done that at the end of the stop rather than the beginning, it would have been prolonged by six minutes. If you set certain time periods to say, well, this isn't very long, 14 minutes, and Turbin isn't very long, then an officer can perform a stop and say, I'm going to spend 14 minutes on a fishing expedition. And if I turn up anything, great. You're wasting a brief amount of time on an issue which we've got your argument. Okay, thank you. As to the second issue, I also do think it's significant with respect to the limiting of the cross-examination. The government throughout its briefs says that it was speculation. There was just speculation that there was a cooperation agreement. I want to be clear that the record does not indicate that it was speculation. I was told by Mr. Hanlon that there was an agreement, some form of agreement, between the state authorities and the witness's attorney. And Mr. Hanlon, on page 57 of the excerpts of record, confirmed that with Judge Shea. So this is not a situation where I was guessing that she may have had one, although I will point out – Would you want to – had you been allowed to ask those questions, what would you have asked and what would you have sought to establish or show? Well, I would have asked her questions about whether or not that would influence her. What was told to her? Was she told that she needed to answer all questions posed to her in proceedings? Did she think that she would be currying favor? We don't know what the state authorities said. You know, you need to be testifying in all proceedings where you are a witness. But I certainly know myself from having represented people that are cooperating. The fact of a cooperation agreement colors every interaction that my clients have had when they're dealing with law enforcement. There was no – was there any hint that there was any kind of agreement or kind of quiet agreement with the Federal Government? There was no – I certainly don't want to say that Mr. Hanlon behaved improperly, Ed. But we don't know what the state authorities told her and Mr. Hanlon didn't know what the state authorities told her. And the Supreme Court has said that my lack of knowledge as to that doesn't mean that I don't get to cross-examine. In the case of Delaware v. Van Arsdale, it was – the person was just in Federal custody. I think that was the – I believe that was the Federal custody case. But you could have cross-examined her, couldn't you, as to her motivation to lie? I could have cross-examined her on her motivation to lie. Could you have cross-examined her on her motivation for testifying? I couldn't get to the issue of bias, the issue of bias as to her reason why. Well, for just a minute – for just a minute you did ask her about – and it came out that when she was first asked about a gun, she didn't know anything about it. But as soon as the police told her she could go to jail, then all of a sudden it was the defendant's gun. That's bias. That is. Shift the blame. Get out of here. But that went away after the first time that she changed her story, without being able to say that she's still doing this. After she was put in the situation of being on the spot with the police officers and wanting to cast blame on someone else so she wouldn't get in trouble, I was prevented completely from asking her whether or not she's still in that situation, as though the jury was not able to assess that form of bias. And if simply being under probation is a fact that the Supreme Court has said is significant enough, can put significant enough pressure on a witness to be reversible error to not ask about, then certainly the case that a person is under some sort of agreement to cooperate is that type of fact. You also ask her about what she knew about guns, and she says she doesn't know anything about them. And then you went on, and she knew that guns are black, she knew the gun was medium-sized, and she knew it wasn't a revolver. Again, suggesting some more bias, and that she's trying to pass this on to somebody else. She says she doesn't know anything about possession of guns, and then she talks about how the gun was put in the box when it was pulled over. I guess our real problem, and I'm not trying to take up all the time here, but we're trying to decide whether we're only thinking about the manner and scope of cross-exam, or whether it's more than that. It's more than that. It's the entire topic that was cut off, the entire topic of bias to favor the government right now. Not at the time of the arrest, but bias to favor the government right now. At the time she was in court, she was under the hopes or expectations, from what I believe, to receive some sort of benefit by currying favor with the state authorities. If there's a confrontation clause violation, then you need to presume that the cross-examination would have had its most damaging effect, and would that have undercut the case. What was the judge's reason for not allowing you to go into that? He said it was not relevant, because it wasn't specific to this case, it wasn't relevant. And certainly I think the Supreme Court has said if a person's under probation, though there is no indication that the person's probation was impacted by the present case, the mere fact of the pressures of being under probation is relevant, reversible error. The mere fact that someone is incarcerated by the federal authorities or state authorities in one of the cases I cite, it was either the, I think it was the Van Arsdale case, is relevant, reversible error. Is there a review for abusive discretion or de novo? It is reviewed de novo. We certainly preserved it. We objected to the court. We asked to be able to bring this in, and he denied it. And it is de novo with respect to whether or not there was a confrontation clause error. And it can be an error either under the rules of evidence or under the confrontation clause, but as Judge Fletcher wrote in the Jenkins case, the standards are really pretty much the same when it comes to exclusion of evidence. With inclusion of evidence in confrontation clause violations, there can sometimes be a disconnect, but the inquiry is pretty much the same. And I read Van Arsdale, which says, By cutting off all questioning at an event that the state, the government conceded had taken place, and that a jury might reasonably have found furnished a witness a motive for favoring the prosecution in his testimony, the court's ruling violated Respondent's rights secured by the confrontation clause. Could it have influenced her testimony, the fact that she was currently hoping to have some sort of favor by the state authorities for cooperating in some way in a case that had to do with guns? It seemed suspicious for me. You were able to cross-examine her about anything she had to do with guns. But I was not able to bring out the fact that she denies any knowledge of guns, and yet she is agreeing to cooperate in a case that has to do with guns.  And it seemed surprising to me that she would disclaim any knowledge of guns, and yet she was supposedly under a cooperation agreement with respect to a case that had to do with guns. That was an issue that the jury was not able to see. What this Court's cases and Supreme Court cases have talked about is different types of impeachment. The fact that I might have been able to impeach her as to other things doesn't mean that I was denied the opportunity to impeach with respect to bias of this sort. And there wasn't other evidence of bias of this sort put before the jury. There might have been other evidence that she made inconsistent statements. There might have been other evidence that she acts in her own self-interest. There might have been other evidence that her demeanor was off. But there was absolutely no other evidence that she had a motive right then and there in court to favor the government as opposed to the defense. Is my standard bias as to this particular evidence, or is my standard bias at all? I review another decision written by my good colleague back in August. I don't know if you read it, Larson. It doesn't seem to me that we're really talking about bias as to particular evidence, but we're reading it about bias and prejudice at all. And that if we get to that, we're in abuse of discretion. Well, I think the Court would abuse its discretion, quite frankly, if you just – I don't think that's the standard, but if it is, if it is, I mean, you just read the Supreme Court cases and quote from them exactly. Could it have had the potential of influencing her testimony? Yes. Did the judge just not cut off questioning, like, okay, you've gone on too long? But he prevented all inquiry into something that could have affected her testimony. That's a confrontation cause violation. You were not allowed to ask about that cooperation agreement in the State Court. Not at all. No information was brought up. Let me ask you, is this just harmless? It is not harmless. Why not? If it's a confrontation cause violation, then you ask whether the government can show that it's harmless beyond a reasonable doubt. And this is not a case where if you disregard her testimony, the evidence was sufficient to find her guilty. If all it would have been is a gun found in the car and my client was a passenger, this case would say that that's not sufficient – this Court's cases say that that's not sufficient evidence of possession. You need something more. Her testimony was critical. There were multiple people in the car. Who did the gun – who was the gun associated with? If the jury didn't believe her, then they would have entered a guilt – a verdict of not guilty. They needed to have all of the information that they could to put her testimony in context. She said it was her testimony that established that he put the gun. That he – Moved the gun from the side and put it into the glove box. Right. If it was just a gun in a glove box and four people there, it's not his car, there wouldn't have been a basis probably to charge any of them. Maybe her. I think what her testimony was is that you're going to be arrested unless you tell me who the gun belongs to. So she points to that guy. And then maintained that story ever since, but changed it around each time she told it. That's why I keep talking to you about what they asked her. I mean, it came out very clearly. She says she doesn't know anything about a gun until she knows that having knowledge of a gun and that it is her car, that it's going to come to rest with her. So it absolutely goes to her bias when she automatically says, and now I say it's them. The bias came out just absolute. You were very good in how you put that together. It's always nice to have. Yes. And so now to suggest that now we're not just talking about bias, we're talking about a particular type of bias now that I've got to go with. So I'm moving from de novo to abuse of discretion. And that's my problem, frankly, ma'am, because I'm thinking based on what my good colleague wrote in Larson, that this is an abuse of discretion. And if it's an abuse of discretion, I'm not sure I can find it. If I go to de novo, that's a totally different review. I believe that it's de novo, but under either standard. Again, I think the fact that it was completely cut off makes it a de novo review and makes it a confrontation clause violation, not just a discretionary call. With respect to the last issue, I can tell you that this is something that has vexed me ever since the Wenner case has come out, is what is good enough to describe something as a building when a person is, when you're looking at an enhancement based on a residential burglary. The Wenner case says that under Washington law, not all residential burglaries involve buildings because the statute refers to dwellings, and dwellings can refer to places such as fenced-in areas. You then have a case such as this one where the information, and we're not saying the information should not be included, the information and the change of police statement, look at everything in there. All you've got is statutory language plus the name of the person to whom the residence pertains and the location of it. Is that good enough? And I don't see how that's good enough. If you take seriously. Just a minute. Let me read. As I read the information, it says, and we've got to look at the documents because we're on a modified categorical here. Count three. On or about December 9, 2002, in the state of Washington, with intent to commit a crime against a person or property, you entered or remained unlawfully in a dwelling, other than a vehicle located at 480 Cole Road, Wapato, Washington, in the residence of Shawn Klingle. Then when I look at his statement on the plea of guilty, I read, Crimes. I have been informed and fully understand that I'm charged with the crimes of, count one, count two, dismissed. Count three. Residential burglary, the elements of which are, with intent to commit a crime against a person or property, to enter or remain unlawfully in a dwelling other than a vehicle. Right back to count three. Then I look at his statement, and in his own words, he says, the judge asked me to state in my own words what I did, making me guilty of this crime. Count three. This is my statement. Now, if I read the whole plea, if I only read on or about I aided or assisted in committing a burglary, that's not going to make it. But if I read count three and what he wrote about count three, and then I read what his statement says, guilty of this crime, referring back to count three, I don't know how to get there. Because dwelling can refer to not a building. Dwelling and residence are synonyms. If dwelling doesn't mean a building, eliminate dwelling from all those things. All it's doing is incorporating statutory language, which is overbroad. Residence is a synonym of dwelling. The offense is labeled residential burglary. Dwelling is then, you look it up in Black's dictionary. They're synonyms. So eliminate those two things. You have the residence of so-and-so, but clearly the definition of a dwelling is a place that a person lives, which can be a fenced-in area. So the fact that it's an actual person's is not surprising. It has to be in order to be a dwelling or residence, which are the same word. So then you have the actual location. If this was a fenced-in area rather than a home, how would you differentiate it? It still has an address. You're over your time. Thank you. I apologize. Thank you. I'll give you a minute in rebuttal. May it please the Court. Tom Hanlon, appearing for the United States, assisting the United States Attorney for the Eastern District of Washington out of the Yakima office. In this case, Mr. Gonzales has raised four issues, two issues regarding the suppression hearing, a trial error regarding the cross-examination and the sentencing error. The first issue raised is whether or not, if I may raise the microphone, is regarding Officer Garcia and whether or not he impermissibly expanded the scope of questioning at the time of the traffic stop. In the first brief filed on behalf of Mr. Gonzales, there's two arguments. The first argument is that Officer Garcia did not have any sort of independent or reasonable suspicion to ask the occupants of the vehicle any questions. Then the second issue is whether or not Officer Garcia prolonged the traffic stop. I would point out that it's undisputed, the testimony at the suppression hearing, that Officer Garcia stopped the vehicle due to a license plate that was not illuminated. He stopped the vehicle at approximately 218 A.N. Officer Garcia determined that Mr. I believe it was Rosales in the backseat, Mr. Rivera in the backseat was a fugitive and had several outstanding warrants. So from the time of the traffic stop until he found that information, only five minutes had elapsed. Ms. Pinnell had asked him on cross-examination approximately how long does it take you to write a citation if you're going to issue a citation for a traffic infraction. Officer Garcia testified that it takes approximately 10 to 20 minutes if he's going to issue a citation. Here, Officer Garcia determined in less than five minutes that there was a fugitive in the car and that then became the focus of his investigation apprehending that fugitive. As this Court has recognized in Mendez as to the first test of reasonable suspicion to expand questioning to ask individuals for identification, that there does not have to be reasonable suspicion and that the ruling of Chavez-Valenzuela, which was relied upon in the initial brief, has effectively been overruled by the Supreme Court in the Muriel decision. Mr. Gonzalez points to United States v. Luckett and argues that case is relevant to the present case as it shows that Officer Garcia expanded the scope of questioning and he prolonged the stop. I'd point out in Luckett that the officer stopped Mr. Luckett for jaywalking, his citation was issued, the involvement with the police and Mr. Luckett at that point should have ended. However, the officer continued to detain Mr. Luckett prior to finding out that he was in fact a fugitive. In this case in Mendez, or similar to this case in Mendez, two officers had Mr. Mendez removed from a vehicle for a traffic infraction, I believe it was registration. He sat on the curb while one officer asked him questions. Another officer ran the vehicle information in his squad car. The officer in the squad car was finished. He determined what was going on with the vehicle. He ran the identification. He then returned to where Mr. Mendez was seating. He overheard a conversation between Mr. Mendez and the other officer, and although the reason for the traffic stop had been completed, he continued to ask him questions. And this court determined that he, in fact, did not prolong the traffic stop, that it was reasonable for that detective who was in the squad car to continue asking Mr. Mendez questions. How do we know in the record that he found out about Rivera within five minutes? I believe attached to the – there was testimony from Officer Garcia at the suppression area, what time the stop was, and then across the examination from Ms. Pinnell, the log sheets came in of the radio traffic of the times that he made the calls, and it was determined that at 2.23 a.m. that's when he ran the name, and he testified that he determined that he, in fact, was a fugitive. I believe his words were that he had several outstanding warrants. The next issue that seems to be the most important. I guess it's customary for the – which police department was it? The Yakima Police Department. It's customary for them to run a check on everybody that's in a vehicle that they stop for a traffic stop? Officer Garcia testified that when he comes in contact with individuals in a car, it's his practice to ask for identification to run names. Is this practice, or is that the customary practice of the department? Is that the department's policy? My understanding was that it was – he said it was procedure. He didn't – I don't believe he specified if it was his procedure or the procedure of the Yakima Police Department, but I would point out that he did ask for names, but he also advised all the occupants of the car that they did not have to provide him with anything. The next issue is in regards to the cross-examination of the witness, and I would just like to lay out some brief background on that issue. Officer Garcia testified at the suppression hearing that at the time of the traffic stop, there was Mr. Villa seated in the driver's seat. The defendant was seated in the passenger seat. The fugitive, Mr. Rivera, was in the backseat along with Mr. Roscoe. As the case proceeded the trial, as was discussed in the motions in limine, Mr. Roscoe, the other witness in the case, could not be found. She fled the jurisdiction. So then we get to Mr. Villa, who's the driver of the vehicle. She was not offered any sort of benefit or any kind of promise, any kind of leniency by the government in the case if she were to testify. She was not a confidential informant, and she was provided at that point with no promises that anything would happen in any case if she were to testify. She was subpoenaed just as any other witness would be and required to come to court. The agent in the case, when he went to find Mr. Roscoe, couldn't find her. He determined that Mr. Villa was, in fact, in custody, that she was in the Yakima County Jail, and that she had been charged with state offenses regarding a burglary of a home and that it was believed that a firearm was involved in that burglary. I was trial counsel in the case. The information was immediately conveyed to defense counsel in this matter. As noted by the court during the testimony of Mr. Villa, this certainly does not appear to be someone who is a cooperating witness. The court even said on the record that this is someone who is obviously very reluctant and does not want to be in court. In fact, during the examination of Mr. Villa, she also testified that she did not want to be there in court and did not want to testify. This court will only find a Confrontation Clause violation if the trial court's ruling limited relevant testimony, it prejudiced the defendant, and denies the jury sufficient information to appraise the biases and motivations of the witness. It's the government's position that the evidence regarding the possibility of the state cooperation agreement in that unrelated matter was not relevant. On the excerpt of record, page 121, the trial court specifically asked the government what information is there about this cooperation agreement. The government advised the court, as it previously advised defense counsel in the matter, that it was their understanding that the state prosecutor and Ms. de Villa's attorney had been working on some sort of agreement regarding that unrelated matter. However, it was clear from the record and undisputed that Ms. de Villa had not been offered in any way or any inference by the government, or there was no inference made by the government, that she would receive any benefit whatsoever if she were to cooperate in the case. In addition, the defense counsel's team had an opportunity to interview Ms. de Villa regarding any questions of the state cooperation agreement Do you think that her understanding, that she might have understood that she needed to cooperate with all prosecuting authorities? I don't believe that there was anything in the record that she would have They weren't allowed to cross-examine her. They were not allowed to cross-examine her. It was the government's position that it was their understanding that her attorney in the state case and the state prosecutor had been working on some sort of agreement. However, it was the understanding of the parties that no agreement had been reached. If there had been cross-examination of Ms. de Villa on this issue, the information that she could have presented would have been her communications with her attorney, the information that she was made aware of by her attorney of what negotiations were going on. The trial court found Were they negotiating a cooperation agreement or a plea agreement that required cooperation or what? Do you know? I don't know, Your Honor. I know that at this point when we were at trial, the defense did not request a continuance to get into it. There had been no plea agreement either by Ms. de Villa or the other parties that were involved in that unrelated case. So the trial court was left with the mere conjecture that there may be a possibility that the state case would be resolved. So the trial court had no information that there was, in fact, an agreement, and it was the position of the parties that no agreement had been reached. When we look at this information that the jury had to appraise the bias and motivations of Ms. de Villa, the jury was aware, number one, that she was currently in jail, as she appeared before them in jail attire. The trial court also allowed defense counsel to question Ms. de Villa about the fact that she had been charged with the crime, despite the fact that there's a presumption of innocence, that she had been convicted of nothing, and she was also able to inquire of the witness whether or not a gun had been involved in that unrelated state case. And those were all issues that were able to be raised on the cross-examination of Ms. de Villa. The government would submit that the jury in this matter certainly had sufficient information regarding the bias and motivations of Ms. de Villa when she testified in this matter. Mr. Gonzalez relies primarily upon two cases, Davis v. Alaska and Delaware v. Van Arsdale. The government would submit that those cases are not relevant to the discussion that we're having today. In Davis v. Alaska, this was a case where the state witness had previously been convicted of a crime and was currently on state probation. When asked to question whether he had ever been questioned like this by law enforcement before, despite the fact that he had a prior conviction and had probably been questioned by law enforcement, he said no. The court found that it was doubtful that Davis would have given or that the state witness would have given that answer had he not known there was a blanket protection from cross-examination. In Delaware v. Van Arsdale, that was a case where the state witness had been charged with a crime. The state prosecutor then dismissed that offense so that he would cooperate in the current case. Once again here, regarding Ms. de Villa in the Gonzalez matter, no charges had been dismissed and no promises had been made for leniency. As noted in the record, she was obviously very reluctant to be in court, and she came in just as any other witness would come in in trial. The problem I have, I guess, and I want to make sure about this is, did the state know or didn't they know that there was an underlying cooperation agreement with the witness at the time the judge made the decision? Did the state know whether or not there was going to be a cooperation agreement? No. Did you, the government, know whether the state, because it was an underlying state charge, had a cooperation agreement with the witness? Because in your briefs you're suggesting that no one knew what they did or they didn't do, but there is one part in the record where you say that you know there's such an agreement, or at least as I read the record. There's two parts in the excerpt of record that deal with the issue of the cooperation agreement when addressed by the trial court, excerpt of record page 56 and 57, I believe, and excerpt of record page 120 and 121. At excerpt of record page 57, I advised the court that it was my understanding that there were, I believe I advised the court, my understanding there was going to be an agreement. We had absolutely no details. Was there going to be or that there was an agreement? We had no knowledge if there was an agreement. What was your wording to the court? I have to review the excerpt of record. I believe I said that there was an agreement, but then on excerpt of record page 121, when the trial court was asking specific questions, I advised the court, just as I advised defense counsel, it was our understanding the state prosecutor and defense counsel were working on an agreement. Whether that was going to be an agreement for Mr. Villa to come in and testify, if it was going to be a lenient plea agreement based upon that cooperation. At the point when we were in trial, it was unknown. It was unknown if they, in fact, were going to reach an agreement, if the co-defendants in the state case were going to plead guilty, if they were going to go to trial. But I guess I'm just interested in exactly what you told the judge, not necessarily what the facts were. I know on excerpt of record page 121, I advised the court that it was the government's understanding that they were working on an agreement. And I believe in excerpt of record page 57, I had indicated there was an agreement, meaning to say that just as an excerpt of record page 121, they were working on some sort of agreement. Okay. Because my excerpt of record, where I was looking at, was between pages 55 and 58 of the excerpt of record. Yes, Your Honor. And then I would just refer to excerpt of record page 121, where there was further clarification of the issue when the trial court wanted further clarification of the issue. Okay. The last issue raised by Mr. Gifford. What was the basis of your knowledge that they were working on an agreement versus having made an agreement? Did you know, or were you just? As disclosed to defense counsel, a week prior to trial, we discovered Ms. Davila was in jail. I contacted the state prosecutor, found out who defense counsel was for Ms. Davila, contacted defense counsel for Ms. Davila to see what was going on. Why was this individual in jail? She was going to be a witness, and she was being served a subpoena to come to trial. At that point is when the government learned that there was some sort of negotiation going on, but everything was in the air because nobody knew what was going to happen with the state case. Now, who told you that? I spoke to Mr. Laws from the prosecutor's office and Mr. Buren, who was representing Ms. Davila, and defense counsel in the case was also aware of who was representing Ms. Davila. As on the record, the court asked her who was the state prosecutor, who was defense counsel, and she advised the court of who counsel was in that matter. Do we review that issue, the confrontation issue, for abuse of discretion or de novo? In this court, in the Lowe decision and in the Bernal decision that's cited in my brief, this court has found the standard of review to be for abuse of discretion. How about the recent Humbug decision in Larson? I am not certain, Your Honor. Okay. But I do show that the James case, the court reflected that it was abuse of discretion, but then found that the court would review if the error was so severe as to amount to a confrontation clause violation, the court would review de novo. That was in James, Your Honor. The last issue raised by Mr. Gonzalez deals with the sentencing enhancement. The base offense level for an individual in possession of a firearm, a prohibited person, is 14. The base offense level is enhanced to level 20 if the government can prove that the defendant had previously been convicted of a crime of violence, a crime of violence either being the use or attempted use of physical force or, as pertinent in our case, the burglary of a dwelling. Mr. Gonzalez relies upon United States v. Winter to say that the government has not met its burden of proof. I point out that on page 979 of the Winter decision, the government's second argument in the case was that the court should find it in the modified categorical approach based solely upon the information that the defendant had been convicted of a crime of violence because the language in the information was that Mr. Winter had been convicted of entering or unlawfully remaining in a property, on property, a dwelling, the residence of, and then provided a name. However, in Winter, this court determined that that alone was not sufficient. The court indicated that the government should have provided either the statement of guilt or the plea agreement to show that the defendant had, in fact, been convicted as charged. This court followed that up in the Darrell Valasquez decision, and in that case, just as in Winter, this court emphasized that last part of the language in the information, the residence of Rina Ramirez. In that case, the government provided sufficient documentation to the court so that the court could determine that the defendant, in fact, did commit a crime of violence. In this case, as required under Winter and Guillermo Valasquez, the government provided not only the information to the court, we also provided the statement of defendant's guilt and the judgment and sentence to show that the defendant was, in fact, convicted as charged. If there are no further questions from the court, I'll rest at this time. Thank you. Thank you. I'm going to please the Court. Thank you. The case I was thinking of previously, I refreshed my recollection, was Alfred v. United States. It's another case that I cited in my brief. In that case, the person, the witness was in custody, and the attorney said, it's my impression that this person is in custody. It may be Federal. It may be State. And I want to bring out their testimony regarding that for whatever bias that may show. And the attorney was not allowed to do that. And the Supreme Court found that that was reversible error, despite the fact that the person didn't know the specifics. The issue, of course, is not what the government understands with respect to an agreement, but what the witness understands. And so Mr. Hanlon's conversations with an attorney, a State attorney, isn't relevant so much as to what the witness may have understood or misunderstood. And the Court got to that. Do you think it makes a difference whether or not there was an agreement that existed? Well, I will tell you on page 121, quote, my understanding is they have an agreement. And I didn't find on page 121, that was on page 57, on 121, where he said he didn't. But why couldn't I ask her about that? Maybe she would have said there wasn't really an agreement, or maybe she would have. But it was certainly not speculation for me, just out of thin air, to think that there was something influencing her testimony. I had a reason for it, a good one, a better reason than was in the Alford case that I cited. And I wasn't able to ask about it at all on a witness who already had weak testimony, and that would have been an additional reason for the jury to disbelieve her. Thank you. Thank you. We appreciate your arguments. The matter is submitted.
judges: Fletcher, Paez, Smith